United States District Court
Southern District of Texas
**ENTERED**
October 16, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IYAD MUHAMMAD ABUELHAWA, | § § | CIVIL ACTION NO 4:25-cv-04128 |
| Petitioner, | § | |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| KRISTI NOEM, *et al*, | § | |
| Respondents. | § | |

OPINION AND ORDER
GRANTING PRELIMINARY INJUNCTION

Petitioner Iyad Muhammad Abuelhawa is a Palestinian national recently taken into custody by Immigration and Customs Enforcement in preparation for removal from the country. He has filed a petition for a writ of *habeas corpus* for unlawful detention. Dkt 1. Respondents are sued in their official capacity as officers or employees of the United States and are collectively referred to as *the Government*.

Abuelhawa doesn't challenge the fact that he is removable or the lawfulness of his removal order that dates to September of 2009. The question is whether he must continue in custody during the pendency of complicated requests and attempts to remove him to Israel, Palestine, or Jordan. Such attempts have been unsuccessful since 2009. And until being taken back into custody, he had been under an order of supervision since 2010 without incident.

Pending is a motion by Abuelhawa for preliminary injunction requesting his immediate release during the pendency of the further requests to other countries to remove him. Dkt 12. The motion is granted because, on the record presented by the Government, it hasn't afforded

Abuelhawa the necessary process to which he is due in order to maintain him in custody.

1.  Background

Petitioner Iyad Muhammad Abuelhawa is a self-described "stateless Palestinian" who has resided in the United States since 1994. Dkt 1 at ¶13. His wife and two minor children are all citizens of the United States. Dkt 12-5 at ¶1 (spouse affidavit).

Abuelhawa owns and operates two local restaurants in the area of Houston, Texas, under the names *Trump Burger* and *Empire Pizza NY Style*. Dkt 1 at ¶14; see also Dkt 12-7 at 2–3 (business registration documents). An affidavit from his spouse avers that (i) Abuelhawa "is the sole provider for our family," (ii) she and their two children depend upon his "support . . . through the proceeds of his restaurants," and (iii) the family "cannot survive financially without his release." Dkt 12-5 at ¶3. The Government presents no evidence to the contrary.

Abuelhawa suffers from chronic health issues. The affidavit from his spouse notes that Abuelhawa (i) is chronically ill with diabetes, (ii) "has lost close to fifty pounds and is in danger of losing his toes and possible legs," and (iii) "has been confined to a wheelchair in detention and has been taken to the emergency room multiple times." Dkt 12-5 at ¶4. Attached medical records establish that he suffers from diabetes and other, related long-term health complications involving his kidney function. See generally Dkt 12-6. His briefing asserts, and the medical records support, that while in custody (i) he has broken several bones in his foot and is confined to a wheelchair, (ii) his legs are "currently numb from the knee down and have limited mobility," and (iii) he has lost one toe to diabetes prior to detention "and is currently in danger of losing his whole foot." Dkt 12 at 12. The Government again presents no evidence to the contrary.

a.  Immigration history

The Government submitted a declaration from Deportation Officer Guadalupe Alvarez, who is assigned to

the Houston, Texas, Field Office of Enforcement Removal Operations. Dkt 21-1 at ¶1 (corrected declaration). It establishes the following.

Abuelhawa entered the United States in July 1994 after being admitted on a visitor visa in Houston, Texas. Id at ¶9. He became a legal permanent resident in November 1996. Id at ¶10.

Abuelhawa was convicted of threatened assault in March 2000 and sentenced to two days in confinement. Id at ¶11. He later pleaded guilty and was convicted of health care fraud in May 2007, for which he was sentenced to forty-six months of imprisonment and three years of supervised release. Id at ¶12.

On December 7, 2007, Abuelhawa received notice to appear with respect to violation of the terms of his status as a legal permanent resident. Id at ¶13, citing §237(a)(2)(A)(iii) of Immigration and Nationality Act. He was then taken into custody upon his release from prison on March 11, 2009. Dkt 21-1 at ¶14.

On September 15, 2009, an immigration judge in Dallas, Texas, ordered Abuelhawa removed from the United States to Israel or (in the alternative) Jordan. Id at ¶15; see Dkt 12-3 (automated case information noting order of removal). The Government then issued multiple travel document requests on his behalf, as follows:

- o *October 1, 2009:* The Government submitted a travel document request to the Embassy of Jordan in Washington and the Consulate of Israel in Houston, Texas. Dkt 21-1 at ¶16.
- o *October 15, 2009:* The Consulate of Israel declined to issue a travel document. Id at ¶17.
- o *October 30, 2009:* The Embassy of Jordan declined to issue a travel document. Id at ¶18.
- o *November 9, 2009:* The Government submitted to the Consulate of Israel in Houston, Texas, a request to return Abuelhawa to Palestinian territory via Israel. Id at ¶19.

3

o *December 1, 2009:* Israel declined the request. Id at ¶20.

Abuelhawa's case was referred to ICE Headquarters "for assistance" on December 8, 2009. Id at ¶21. He was ultimately released on an "Order of Supervision" on February 17, 2010. Id at ¶22; see Dkt 12-2 (reporting on OSUP paperwork).

As to the time between 2010 and 2024, Abuelhawa separately establishes that he consistently completed check-in appointments with ICE on a yearly basis. See Dkt 12-2 (reporting on OSUP paperwork); see also Dkts 12 at 2–3 & 19 at 3. A further declaration from his spouse also establishes that Abuelhawa "has made formal requests through applications for travel documents to the Israeli Embassy on a yearly basis," but the Israeli consulate in Houston and the embassy in Washington "refuse to accept our applications." Dkt 19-1 at ¶¶3–4. She submits one exemplar request, while noting that other copies were destroyed when their home flooded in Hurricane Harvey. Id at ¶5; see Dkt 19-2 (2019 travel document request). She also confirms that neither Abuelhawa nor either of his parents have ever lived in Jordan or had a travel document or passport from that country. Dkt 19-1 at ¶6.

Abuelhawa is presently detained at the Montgomery Processing Center in Conroe, Texas. Dkt 21-1 at ¶28. The Alvarez declaration states that he "was brought back into custody" on June 2, 2025. Dkt 21-1 at ¶23. The declaration gives no explanation or evidence of any violation at any time by Abuelhawa of terms imposed as to his supervised release. It instead states without explanation that Abuelhawa's detention began "after receiving concurrence from Headquarters that there is a significant likelihood of removal." Ibid.

On July 18, 2025, the Government submitted travel document requests "to the Embassy of Jordan and to Headquarters for a request to Palestine." Id at ¶24. The Office of Enforcement and Removal Operations is still awaiting response to these requests. Ibid. The declaration observes that ICE hadn't made any further attempt to

obtain travel documents for Abuelhawa from 2009 until taking him back into custody. Id at ¶25.

The declaration also states, without detail, "To ERO's knowledge, both Israel and Jordan are both currently issuing travel documents for removal. At the moment, the travel document request processing period is ninety days or longer for them to approve." Id at ¶27. Notably, the declaration doesn't indicate any further request having been made to Israel. But see Dkt 18 at 8 (argument by Respondent suggesting, without evidence, that request is also pending with Israel).

          b.   Procedural history

On September 1, 2025, Abuelhawa filed a petition for writ of *habeas corpus* asserting a violation of procedural due process. Dkt 1 at ¶¶22–24. The petition asserts arbitrary detention with citation to 8 CFR §241.13. Id at ¶32. His paired motion for temporary restraining order was very short and argued no particular statute or regulation, while attaching exhibits with unclear citation and use. See Dkt 4. It was thus denied after hearing, without prejudice to a more fulsome filing with any motion seeking a preliminary injunction. See Dkt 9.

Pending is a motion by Abuelhawa for preliminary injunction. Dkt 12. On the merits, the motion itself focused only on 8 CFR §241.4(l)(1), which governs the detention of aliens under final removal orders when the Government has *not* previously determined that there is no significant likelihood of removal. Dkt 12 at 7–9. The Government responded on that basis. Dkt 14 at 6–7. Abuelhawa then specified different arguments in his reply brief under 8 CFR §241.13, along with citation of recent decisions by federal courts granting relief in similar circumstances under that regulation. Dkt 16 at 2–9.

At hearing on September 18, 2025, Abuelhawa withdrew his original argument under §241.4(l)(1), with the parties also noting agreement that §241.13 is the regulation applicable to aliens in Abuelhawa's circumstance. See Dkt 17 (minute entry). The parties were

thus ordered at the conclusion of hearing to further brief specific issues under §241.13. Id at 2. They did so. Dkts 18 (surreply by Government) & 19 (further reply by Abuelhawa).

Based on the further reply by Abuelhawa, the Government was subsequently ordered to provide evidence regarding whether the procedural requirements of §241.13(i)(3) were met. Dkt 22. It did so. Dkt 25. Abuelhawa then responded, challenging the reliability and sufficiency of such evidence. See Dkt 26.

### 2. Legal standard

The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held. *University of Texas v Camenisch*, 451 US 390, 395 (1981). To obtain such equitable relief, the burden is upon the applicant to make a sufficient showing of (i) a substantial likelihood of success on the merits, (ii) substantial threat of irreparable injury, (iii) the threatened injury outweighs any harm the order might cause to the defendant, and (iv) the injunction will not disserve the public interest. *City of El Cenizo, Texas v Texas*, 890 F3d 164, 176 (5th Cir 2018); see also *Winter v National Resource Defense Council, Inc*, 555 US 7, 20 (2008).

"The decision to grant or deny a preliminary injunction lies within the sound discretion of the trial court." *White v Carlucci*, 862 F2d 1209, 1211 (5th Cir 1989), quoting *Apple Barrel Productions, Inc v Beard*, 730 F2d 384, 386 (5th Cir 1984).

### 3. Analysis

The main point in contention between the parties concerns the substantial likelihood of success on the merits. But this is only because the Government provided no argument on any other factor, thus conceding that they weigh in favor of granting the requested relief. See Dkts 14, 18 & 25. Even so, they will be addressed given their particular import in these individualized circumstances.

a.  Statutory and regulatory framework, along
with constitutional constraints

The statutory provision governing review in this case
is 8 USC §1231. It provides in part that "when an alien is
ordered removed, the Attorney General shall remove the
alien from the United States within a period of 90 days." Id
at §1231(a)(1)(A). During this 90-day removal period, DHS
and ICE must detain the alien. Ibid. Upon expiration of the
removal period, the Government may continue to detain
certain aliens or release them under conditions of
supervision. Id at §1231(a)(6). This applies to (among
others) aliens who have been ordered removed for criminal
conduct. Ibid.

The statute doesn't explicitly limit the duration of any
such continued detention. But the Supreme Court has
determined it to be subject to constitutional constraints. In
*Zadvydas v Davis*, the Court interpreted the statute to
limit post-removal detention to a period "reasonably
necessary to bring about the alien's removal from the
United States." 533 US 678, 689 (2001). And it held in that
regard that post-removal-period detention for six months
is "presumptively reasonable." Id at 701. It further held
that, after such six-month period, "once an alien provides
good reason to believe that there is no significant likelihood
of removal in the reasonably foreseeable future, the
Government must respond with evidence sufficient to
rebut that showing." Ibid.

The parties disagree over the extent to which *Zadvydas*
applies in this case. Abuelhawa argued at hearing that it's
inapplicable because this case involves his *re*-detention,
not *initial* detention. The Government argued that
*Zadvydas* addressed *post*-removal-period detention
generally, which would naturally include both continual
post-removal-period detention and re-detention after an
interval of release. Dkt 18 at 4.

Nothing in *Zadvydas* appears to cabin its
determination with respect to procedural safeguards *solely*
to continual post-removal-period detention. It's thus
assumed to apply. That said, such argument doesn't fully

7

join issue on the pertinent point—being whether the presumptively reasonable six-month period of detention *restarted* when Abuelhawa was re-detained or must be calculated so as to *include* his prior detention. Most courts to consider the issue have concluded that the *Zadvydas* period is cumulative, motivated by a concern that the federal government could otherwise detain aliens indefinitely by continuously releasing and re-detaining them. See *Siguenza v Moniz*, 2025 WL 2734704, *3 (D Mass); *Nguyen v Scott*, 2025 WL 2419288, *13 (WD Wash); *Escalante v Noem*, 2025 WL 2206113, *3 (ED Tex); *Diaz-Ortega v Lund*, 2019 WL 6003485, *7 n 6 (WD La), *Hamama v Adducci*, 2019 WL 2118784, *3 (ED Mich); *Sied v Nielsen*, 2018 WL 1876907, *6 (ND Cal); *Chen v Holder*, 2015 WL 13236635, *2 (WD La). But see *Guerra-Castro v Parra*, 2025 WL 1984300, *4 (SD Fla) (starting new count from time of re-detention), citing *Thai v Hyde*, 2025 WL 1655489, *3 (D Mass) (same).

The underlying concern as to release and immediate, punitive re-detention isn't present here, given that over fifteen years has passed between Abuelhawa's earlier detention in 2009 and the imposition of his present custody earlier this year. Even so, a uniform rule that counts and sums prior time in detention is appropriate. It is, after all, liberty at issue. And even under *Zadvydas*, the Government has the ability to maintain and continue custody. But it must simply respond with *individualized* evidence to rebut any showing by the alien "that there is no significant likelihood of removal in the reasonably foreseeable future." 533 US at 701.

Here, the original removal order was entered in 2009, and Abuelhawa at that point spent well more than six months in detention. See Dkt 21-1 at ¶¶14–22 (indicating custody of eleven months). As such, the six-month presumptively reasonable period has concluded. And so, current and continued detention of Abuelhawa isn't presumptively reasonable under *Zadvydas*. This serves to sharpen the focus on the Government's compliance with at-issue regulatory requirements.

As noted above, the parties agree that 8 CFR §241.13 controls here. This was an amendment of existing detention standards in light of the decision in *Zadvydas*. See Continued Detention of Aliens Subject to Final Orders of Removal, 66 Fed Reg 56967, 56970 (2001) (amending §241 and stating "the procedures for the Service to evaluate an alien's challenge to the reasonableness of his or her continued detention, as provided in *Zadvydas*").

The scope of the regulation provides at the outset:

> This section establishes special review procedures for those aliens who are subject to a final order of removal and are detained under the custody review procedures provided at § 241.4 *after* the expiration of the removal period, *where* the alien has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future.

8 CFR §241.13(a) (emphasis added).

The regulation then specifies the process for aliens subject to final removal orders to submit written requests for release to ICE by "asserting the basis for the alien's belief that the alien be removed in the reasonably foreseeable future." 8 CFR §241.13(d)(1). ICE must ultimately "issue a written decision . . . regarding the likelihood of removal and whether there is a significant likelihood that the alien will be removed in the reasonably foreseeable future." 8 CFR §241.13(g). And in making that decision, ICE is to consider "all the facts of the case including, but not limited to, the history of the alien's efforts to comply with the order of removal, the history of [ICE's] efforts to remove aliens to the country in question or to third countries, including the ongoing nature of [ICE's] efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, and the views of the Department of

State regarding the prospects for removal of aliens to the country or countries in question." 8 CFR §241.13(f).

After an alien (as here) has been released on an order of supervision, the Government may revoke release either for violating conditions of release, under §241.13(i)(1), or for removal, under §241.13(i)(2). Pertinent in this case is the latter, which provides:

> The Service may revoke an alien's release under this section and return the alien to custody *if, on account of changed circumstances, the Service determines* that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future.

8 CFR §241.13(i)(2) (emphasis added).

In situations when the Government seeks to revoke such release, §241.13(i)(3) then provides the procedures necessary for doing so:

> Upon revocation, the alien will be notified of the reasons for revocation of his or her release. The Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification. The alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision. The revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release.

8 CFR §241.13(i)(3).

With that regulatory framework in mind, consideration of the merits is now in order.

### b. Substantial likelihood of success on the merits

The parties disagree at the outset as to the proper definition of the *status quo* and its import with respect to the governing standard for the requested relief, especially in terms of the burden of proof and upon whom it rests. This is considered first, after which follows the contentions on the merits.

### i. Assessment of the *status quo*

Abuelhawa contends that the *status quo* must be determined by reference to "the last peaceable uncontested status" existing between the parties before the dispute arose. Dkt 12 at 5, in part citing *Canal Authority of Florida v Callaway*, 489 F2d 567, 576 (5th Cir 1974). This is consistent with characterization of the *status quo* by the Fifth Circuit for many years. For example, in *United States v FDIC*, it observed that "the district court has the equitable power to return the parties to their last uncontested status." 881 F2d 207, 210 (5th Cir 1989).

The Government argues instead that the core inquiry is whether the requested injunction is *mandatory* or *prohibitory*. Dkt 14 at 3–4. This turns on "whether the non-moving party is being ordered to perform an act, or refrain from performing one." *Schrier v University of Colorado*, 427 F3d 1253, 1260 (10th Cir 2005). It contends that the relief sought by Abuelhawa is mandatory, as he seeks an affirmative order that he be released from current custody. And it concludes that a mandatory injunction requires Abuelhawa to make a showing of "a clear entitlement to relief." Dkt 14 at 5, citing *Justin Industries, Inc v Choctaw Securities, LP*, 920 F2d 262, 268 n 7 (5th Cir 1990).

Abuelhawa doesn't expressly address the distinction between mandatory and prohibitory injunctions in reply. But the requested relief is for a mix of both, as it seeks to *prohibit* the Government from continuing to hold him in custody and to *compel* his immediate release. See Dkt 16

at 13. His implicit argument, however, is that the lower standard of proof for prohibitory injunction itself applies. And the Fifth Circuit in that respect holds, "To show a likelihood of success, [the movant] must present a prima facie case, but need not provide that [it is] entitled to summary judgment." *Title Max of Texas, Inc v City of Dallas*, 142 F4th 322, 329 (5th Cir 2025), quoting *Daniels Health Sciences, LLC v Vascular Health Sciences, LLC*, 710 F3d 579, 582 (5th Cir 2013).

The cases are admittedly unclear in this respect. It appears that the Fifth Circuit proceeds first upon determination of the proper *status quo*, and only then determines the burden of proof upon assessment whether the injunctive relief would be mandatory or prohibitory with respect to that *status quo*. For example, in *Lake Charles Diesel, Inc v General Motor Corp*, the defendant terminated a contract, prompting the plaintiff to sue and move for a preliminary injunction. 328 F3d 192, 193–95 (5th Cir 2003). The Fifth Circuit held that the attempt by plaintiff to nullify the contract termination didn't amount to a change in the *status quo*. Id at 196. Instead, the requested preliminary injunction would merely maintain the actual *status quo*, which was the uninterrupted continuation of a decades-old contract. Ibid. In other words, the Fifth Circuit recognized the last uncontested state of the parties' relationship leading up to the suit as the *status quo* itself.

The decision in *Title Max of Texas* also more recently illustrated the same point with reference to the burden of proof. 142 F4th at 328. Plaintiff there sought a preliminary injunction enjoining an amendment to a city ordinance, which it said devastated its business. Id at 326. The district court treated the request as one for a *mandatory* injunction—and thus requiring a "heightened" showing on likelihood of success on the merits—because the amended ordinance was already in effect when suit was filed. Id at 328–29; see *TitleMax of Texas, Inc v City of Dallas*, 2021 499448, *5–6 (ND Tex) (findings and recommendation of magistrate judge), adopted by *TitleMax of Texas, Inc v City*

*of Dallas*, 2021 WL 4991989 (ND Tex). The Fifth Circuit disagreed, holding that the lower standard with respect to *prohibitory* injunctions pertained. *TitleMax of Texas, Inc*, 142 F4th at 328. Put differently, the last, peaceable, uncontested status was *prior to* the amendment. And thus, injunction preserving that *status quo* was properly characterized as *prohibitory*, which in turn dictated the lower standard of proof.

This is a sensible approach, otherwise the *status quo* would always be locked in upon whatever situation is at hand only *after* an offending action brought the parties into dispute. As phrased by a respected treatise on civil procedure:

> [C]ourts also often recognize that a party may be ordered to restore the status quo ante, such as when a defendant on notice in an injunction proceeding completes the acts sought to be enjoined. This is sometimes referred to as "the last peaceable uncontested status." *Accordingly, the status quo is not the conditions existing at the time the lawsuit was filed or the preliminary injunction motion heard.* The court issuing a preliminary injunction must define the last peaceable uncontested status in order to determine whether to issue the preliminary injunction based on the facts of the case before it. There is no mechanical test.

Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2947 (West 3d ed September 2025 update) (emphasis added, footnotes omitted).

As Abuelhawa correctly notes here, the last, peaceable, uncontested status between himself and the Government was his release on terms of supervision that existed for over a decade. Any order of injunction commanding action by the Government with respect to that status between the parties would be prohibitory only, in that such order would

simply direct that the Government *not* take action contrary to that *status quo*.

Interestingly here, even were the Government correct that the relevant *status quo* is the fact that Abuelhawa has been returned to detention, the necessary and preliminary injunctive relief would still be only prohibitory (and not mandatory) in nature. This is so because, as requested by Abuelhawa, injunction would simply prohibit the Government from taking any continued action to deprive Abuelhawa of his liberty as it existed under his order of supervised release. Would that implicitly require the Government to take affirmative steps towards compliance? In some sense, yes. But again, the focus and starting point is upon a man at liberty. Injunctive relief to secure that preexisting state can be readily framed in solely prohibitory terms.

Regardless, and in sum on this point, the heightened clear-entitlement standard requested by the Government doesn't apply. Instead, to show a likelihood of success, Abuelhawa "must present a prima facie case, but need not prove that [he is] entitled to summary judgment." *TitleMax of Texas, Inc*, 142 F4th at 328.

ii.   Significant likelihood of removal

As noted, the parties agreed at hearing that 8 CFR §241.13(i)(2) controls analysis, given that revocation of release (and not continual detention) is at issue. But they dispute what substantive showing must be made, and by whom. Abuelhawa argues that in re-detention cases, the Government bears the burden to show that removal is now likely in the reasonably foreseeable future. Dkt 16 at 8. To the contrary, the Government argues that an alien always bears the burden of showing no significant likelihood of removal. Dkt 18 at 2–6.

The Government is correct, at least insofar as Abuelhawa must make a threshold showing before analysis is even called for under §241.13(i)(2). This is so because the "scope" of the regulation itself proceeds solely upon a situation "where the alien has provided good reason to

believe there is no significant likelihood of removal." 8 CFR §241.13(a).

As to whether *no significant likelihood of removal* exists, the alien must "demonstrate that 'the circumstances of his status,' or the existence of 'particular individual barriers to his repatriation' to his country of origin are such that there is no significant likelihood of removal in the reasonably foreseeable future." *Tawfik v Garland*, 2024 WL 4534747, *3 (SD Tex), quoting *Idowu v Ridge*, 2003 WL 21805198, *4 (ND Tex). "Speculation and conjecture are not sufficient" to make this showing, nor is a "lack of visible progress" toward removal sufficient in and of itself. Ibid. But where there is "virtually no hope of repatriating" a detainee, courts have found an institutional barrier sufficient to show there is no significant likelihood of removal. *Apau v Ashcroft*, 2003 WL 21801154, *3 (ND Tex).

Abuelhawa plainly makes a sufficient showing of his *prima facie* case in this regard. For it is in no way disputed that (i) neither Jordan, nor Israel, nor Palestine agreed or was able to receive Abuelhawa in 2009, (ii) he has annually made request of Israel for return or travel documents, as required under his terms of release, to no avail, (iii) the same person remains King of Jordan with no indication of change in position, and (iv) ongoing war, strife, and conflict in Gaza has proceeded for just over two years, since October 7, 2023. Together, per the terms of §241.13(a), this is sufficient proof by "the alien" of "good reason to believe there is no significant likelihood of removal." Suggestion of return in the reasonably foreseeable future of a Palestinian national to any of Jordan, Israel, or a Palestinian territory is objectively specious, especially where the record includes prior rejection of attempt at removal in times of less strife, paired with subsequent and recent rejection of requests, even if such rejections can be attributed to mere inaction of the putative receiving country.

This shifts analysis, then, to §241.13(i)(2), as to revocation of release to pursue removal. The requisite showing under that subsection must be made, and of its terms can only be made, by the Government. This is so

15

because the provision states that an alien may be returned to custody "if, on account of changed circumstances, *the Service determines* that there is a significant likelihood that the alien may be removed in the foreseeable future." 8 CFR §241.13(i)(2) (emphasis added). A number of recently decided cases applying §241.13(i)(2) are in accord that, upon revocation of release, the Government bears the burden to show a significant likelihood that the alien may be removed in the reasonably foreseeable future. See *Escalante v Noem*, 2025 WL 2206113 at *3; *Balouch v Bondi*, 2025 WL 2871914, *2 (ED Tex); *Roble v Bondi*, 2025 WL 2443453, *4 (D Minn); *Van Nguyen v Hyde*, 2025 WL 1725791, *3 (D Mass).

The Alvarez declaration states only, and quite baldly, that "concurrence from Headquarters" indicated "that there is a significant likelihood of removal" as to Abuelhawa. Dkt 21-1 at ¶23. Noticeably lacking is any "account of changed circumstances." This itself evinces a lack of accord with §241.13(i)(2), and thus with the requirements of procedural due process. And that lack of record is particularly stark. Because on briefing toward preliminary injunction, the Government was specifically ordered to address, "with respect to Palestinian individuals with Israeli citizenship, the extent to which, if any, such requests have been made to Jordan, Israel, and/or a Palestinian authority since October 7, 2023, and, if so, whether such requests have been accepted or rejected." Dkt 9 at 2. The Alvarez declaration pointedly fails to address that order in any way. See Dkt 21-1.

As such, there is simply no *evidence* by which to support a finding of "a significant likelihood of removal" in these circumstances. And a number of recently decided cases applying §241.13(i)(2) are in accord that the Government fails to meet its burden where it provides only conclusory statements as to the likelihood of removal. For example, in *Escalante v Noem*, the Government failed to meet its burden by providing only "conclusory statements that they [had taken] steps to remove [the petitioner] to Mexico or perhaps Canada." 2025 WL 2206113 at *4 ; see

also ibid: "A remote possibility of an eventual removal is not analogous to a significant likelihood that removal will occur in the reasonably foreseeable future." The same was true in *Balouch v Bondi*, where the Government "only made conclusory statements via written declarations that they [were] taking steps to remove [the petitioner] to Iran." 2025 WL 2871914 at *3. See also *Roble v Bondi*, 2025 WL 2443453 at *4 (finding Government didn't meet its burden of showing changed circumstances by "bare fact that ICE officials . . . requested third-country removal assistance from ICE headquarters").

Cases cited by the Government don't call for a different conclusion. Several don't inform how to properly consider and apply §241.13(i)(2). For example, see *Ali v Department of Homeland Security*, 451 F Supp 3d 703, 708–09 (SD Tex 2020) (not considering or applying §241.13 as "not relevant" to decision); *Diaz-Ortega v Lund*, 2019 WL 6003485 at *15 (conducting analysis under 8 CFR §241.4, not 8 CFR §241.13, in re-detention case). And others are factually distinguishable as to *the significant likelihood of removal*, given that evidence was of record that the receiving nations had accepted similarly situated detainees in the past. For example, see *Salim v Sessions*, 2019 WL 13218806, *5 (SD Tex) (deportation officer swore that he had "no reason to doubt" Pakistan would issue travel document for petitioner because ICE had received travel documents "in the past and in similar cases"); *Diaz-Ortega v Lund*, 2019 WL 6003485 at *14 (agent testified ICE "generally [had] no difficulty obtaining travel documents from Honduras"); *Apau v Ashcroft*, 2003 WL 21801154 at *3 (evidence of similar case demonstrating that Ghana "accepts back its citizens who are deported" from United States); *Nagib v Gonzales*, 2006 WL 1499682, *2 (ND Tex) (deportation officer swore that "Sudanese government has in the past issued travel documents to Sudanese citizens"). Still others included evidence that receiving nations in those cases were actively cooperating with travel document requests. For example, see *Tawfik v Garland*, 2024 WL 4534747 at *4 (evidence that Yemen issued travel

documents on petitioner's behalf in preparation for his removal); *Yaro v Mukasey*, 2008 WL 4816657, *1–3 (WD Tex) (evidence that petitioner had expired passport and valid identification issued by Mali, and Malian officials confirmed receipt of travel document request and assured cooperation in such request).

To the contrary here, the Government hasn't provided *any* evidence that the identified, potential receiving nations or territories (Israel, Jordan, or Palestine) have accepted a single Palestinian detainee at any recent time. And there is no evidence of any cooperation or response to the many travel documents requests sent by the Government and Abuelhawa since 2009. As such, the Government hasn't demonstrated that there is *any* likelihood of removal, much less a *significant* one. This in turn means that, in terms of the request for a preliminary injunction, Abuelhawa has demonstrated a substantial likelihood of success on the merits.

### iii.    Procedures upon revocation of release

Abuelhawa also contends that the Government hasn't complied with its related notification, interview, and informational obligations under 8 CFR §241.13(i)(3). Initial briefing wasn't clear whether the Government complied with these requirements when revoking Abuelhawa's release. See Dkts 16 at 9 (reply of Petitioner reply) & 19 at 9–10 (response of Petitioner to surreply of Respondent). The Government was thus ordered to make an evidentiary filing on this point. Dkt 22 at 2.

The Government then provided the declaration of Deportation Officer Shaun Vila, who processed Abuelhawa upon revocation of his supervised release. Dkt 25-1 at 1. He states that Abuelhawa received a "processing interview," during which he was "informed of his current immigration status" and that his release was revoked "due to ICE's intention to execute the removal order." Id at 2. Abuelhawa also "was served all the required paperwork" and "notified and was given the opportunity to respond to the reasons for revocation stated in the notification." Id at 2.

Such recital largely and only tracks the regulatory language. And at least one court has recently found §241.13(i)(3) not met where the Government declaration lacked individualized specification and provided little more than recital of the regulatory language itself. See *Roble v Bondi*, 2025 WL 2443453 at *3–5. But its conclusion at base was that boilerplate recital is insufficient to meet the requirements of §241.13(i)(2). That topic is, and has been, appropriately addressed above.

As to §241.13(i)(3) itself, the Government has mustered evidence by an officer with knowledge as to what allegedly occurred upon re-detention. To put §241.13(i)(3) squarely at issue, Abuelhawa would need to make his own proffer at least calling into question such evidence. To the contrary, he nowhere suggests that the statements in the declaration are untrue or that no such interview or reasons were given. See Dkt 26 at 2–3 (arguing declaration as unreliable, without attempting any affirmative, contrary showing). He thus fails to make any *prima facie* showing as to this subsection.

As such, it is inappropriate to grant independent relief on this basis.

### c.   Other preliminary injunction factors

The Fifth Circuit applies a sliding-scale analysis to the four preliminary injunction requirements. *TitleMax of Texas, Inc*, 142 F4th at 328. The likelihood of success on the merits and the extent of potential irreparable injury are the most critical. *Valentine v Collier*, 956 F3d 797, 801 (5th Cir 2020). But no factor has a "fixed quantitative value." *Mock v Garland*, 75 F4th 563, 587 (5th Cir 2023) (citation omitted). As observed by the Fifth Circuit at length:

> The importance and nature of the likely success on the merits requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of interlocutory relief and the relative balance of

> the threatened hardship faced by each of the parties. Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief.

*TitleMax of Texas, Inc*, 142 F4th at 328 (cleaned up).

As mentioned above, the Government addresses only its chance of success on the merits, without in any way arguing (much less presenting evidence on) whether a substantial threat of irreparable injury might befall Abuelhawa, whether his threatened injury outweighs any harm the requested injunction might cause to the Government, and whether any injunction will not disserve the public interest. This is fatal to its argument to oppose the relief requested by Abuelhawa, given the robust showing that he makes as to each.

*As to substantial threat of irreparable injury*, Abuelhawa must show that "irreparable injury is likely in the absence of an injunction." *Winter v Natural Resources Defense Council, Inc*, 555 US 7, 22 (2008). The potential for such injury is undeniable here. Most obvious, if it is ultimately determined that the present detention is unlawful, is the fact that the fundamental right to liberty enjoyed by Abuelhawa is impeded daily. This alone is sufficient to establish irreparable injury. *National Association for Gun Rights, Inc v Garland*, 697 F Supp 3d 601, 628–629 (ND Tex 2023), quoting *Opulent Life Church v City of Holy Springs*, 697 F3d 279, 295 (5th Cir 2013): "The loss of [constitutionally protected] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

But individual circumstances make the threat of irreparable injury all the more severe. Detailed at the outset are Abuelhawa's multiple chronic medical conditions—diabetes, high cholesterol, and kidney disease—that have worsened during his time in custody. See Dkt 12 at 11–12, citing Dkts 12-5 (spouse affidavit) & 12-6 (medical records). In short, he has been hospitalized

at least five times, is confined to a wheelchair, and is at risk of losing a foot or entire leg to diabetes.

Abuelhawa also notes the financial hardship imposed upon his family during detention. He is a small business owner and the "sole provider" for his family, which includes his wife and two minor children, each of whom is a US citizen. Dkt 12-5 at ¶2 (spouse affidavit). His wife adequately explains that their family "cannot survive financially without his release." Id at ¶3.

In sum, loss of liberty is certain, health consequences are grave, and a family's financial situation is dire. The Government disputes none of this, thus conceding that this factor weighs in favor of Abuelhawa. And it is further determined here that it weighs heavily so.

*As to the public interest and the balance of threatened injury and harm,* the factors merge when the government is a party. *Nken v Holder*, 556 US 418, 435 (2009). Both weigh in favor of Abuelhawa.

Given the substantial threat of irreparable injury to Abuelhawa, any countervailing harm to the Government would need to be significant. But the Government hasn't attempted to identify any harm that it might suffer if an injunction releasing Abuelhawa was issued. True, it certainly has an interest in lawful deportation of those here whose presence is contrary to law. But there's no reason to believe that return of Abuelhawa to supervised release will impede any future removal efforts. From 2009 to 2025, he has reported to ICE per the conditions of his order of supervised release. Dkt 1 at ¶20. And there is no evidence to suggest that the Government will be impeded in its efforts to continue removal efforts.

The Government also hasn't identified any public interest that will be harmed by the proposed injunction. At minimum, no evidence suggests any concern regarding potential danger to the community or flight risk. Beyond that, there is "no public interest in the perpetuation of unlawful agency action." *Louisiana v Biden*, 55 F4th 1017,

1035 (5th Cir 2022). Nor could there be any legitimate public interest in continuing unlawful detainment.

The Fifth Circuit observes, "Where the other [preliminary injunction] factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief." *TitleMax of Texas, Inc*, 142 F4th at 328. It's determined above that Abuelhawa has demonstrated a *substantial* likelihood of success on the merits. But even if viewed as only *some* likelihood, the requested preliminary injunction is appropriate here, given the significant weight of the other factors.

4. Conclusion

The motion by Petitioner Iyad Muhammad Abuelhawa for a preliminary injunction is GRANTED. Dkt 12.

It is hereby ORDERED that (i) Respondents in this action are ENJOINED from further holding Petitioner in custody, and (ii) they are COMPELLED to return him immediately to the conditions of his preexisting order of supervision.

For the avoidance of doubt, while Petitioner remains on supervised release, nothing prevents Respondents from re-detaining and removing him if proper travel documents are secured and there is a significant likelihood of his removal to Israel, Jordan, a Palestinian territory, or an alternative third country after the proper evaluation of any credible fear claim has been made per the applicable regulations.

SO ORDERED.

Signed on October 16, 2025, at Houston, Texas.

Hon Charles Eskridge
United States District Judge